UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DIXIE GOSTOLA,

        Plaintiff,                    Case No. 13-cv-15165

v.                                      Honorable Thomas L. Ludington

CHARTER COMMUNICATIONS, LLC,

        Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS MOOT, AND DENYING DEFENDANT'S MOTION TO ADJOURN**

Plaintiff Dixie Gostola filed a complaint on December 18, 2013 alleging that she was terminated by Defendant Charter Communications, LLC, in violation of the Family and Medical Leave Act ("Act"). 29 U.S.C. § 2601-ff. Specifically, she alleges that her termination by Charter states a claim under both the interference and retaliation theories of relief under the Act. See ECF No. 1, ¶¶ 36 & 46. On September 30, 2014, Gostola and Charter filed cross-motions for summary judgment. ECF Nos. 14 & 15. Charter claims that both Gostola's interference and retaliation claims fail as a matter of law and that Gostola's complaint should be dismissed. Gostola claims that Charter fails to show that a material dispute of fact exists regarding her interference claim and summary judgment should be granted in her favor.

No material facts concerning the manner in which Charter monitored Gostola's performance are in dispute. Both parties agree that the period in which Gostola was on leave factored into Charter's calculation of Gostola's performance evaluation which eventually led to her termination. For that reason, no reasonable juror could conclude that Charter did not use

Gostola's FMLA leave as a negative factor in its decision to discipline and then terminate Gostola. Thus, Gostola's summary judgment motion will be granted and a trial on damages scheduled.

## I.

### A.

Gostola has worked in the advertising industry since she graduated college in 1994. ECF No. 14, Ex. 33 at 20. Her first position was with Cable One where she worked as an account representative. *Id*. at 18. In that capacity her "responsibility was to create new business for the company by finding clients to advertise on local cable television." *Id*. In 1995, Cable One was sold and became Cable Time. *Id*. at 19. She remained in her same position with Cable Time where her goal was to "sell cable TV advertising." *Id*.

### B.

Charter retained Gostola when, in August, 2000, ECF No. 14, Ex. 33 at 5, Charter acquired her prior employer, Cable Time. *Id*. at 20-21. With Charter, Gostola was "focused on working with current clients that [she] had established prior to joining Charter, creating new accounts, continuing to produce effective ad campaigns for each client, building those relationships, [and] upselling those clients." Id. at 21. Gostola's official position with Charter was "Account Executive." ECF No. 14 at 2.

Gostola was responsible for the "Mount Pleasant zone" and worked out of Charter's Saginaw office. *Id*., Ex. 33 at 26. According to Gostola, the "Mount Pleasant zone" included "an area to the north, Farwell, Clare, Mount Pleasant, Shepherd, Alma, Breckenridge, Ithaca, pretty much along the 127 corridor." *Id*. Gostola had been responsible for this territory since she

entered television advertising sales in 1995. *Id*. Gostola remained with Charter up until her termination on December 6, 2013. *Id*. at 6.

### C.

During part of the period in which Gostola was with Charter, her most significant client was the Soaring Eagle Casino and Saganing Eagles Landing. *Id*. at 28-29. These accounts were the largest billing accounts in the state of Michigan and contributed to some of Gostola's most productive years with Charter. *Id*. In 2010, however, the casino hired a new advertising agency and began booking advertising space through a national advertisement booking exchange, Interconnect. *Id*. at 29. Following the loss of the casino account, Gostola's productivity declined. *Id*. Eventually, in January 2012 she was placed on a Managed Action Plan due to her declining performance. ECF No. 14, Ex. 13. This marked the beginning of a two year period in which Gostola was on a Managed Action Plan more often than she was not. In fact, she was on a Managed Action Plan for thirteen straight months prior to her termination.

### D.

Advertisement sales performance at Charter is measured by comparing revenue realized to projected revenue over specified periods of time. ECF No. 14 at 4. "Every [Account Executive] ha[s] an individualized yearly sales budget for both cable television and internet banner advertising." *Id.* The budget for each salesperson is determined annually by management and the budget is then projected over the course of the year. *Id*. Thus, some months may have higher projected budgets while others are lower. Charter expects its salespeople to attain 97% of their projected budget each month. *Id*., Ex. 33 at 57.

A salesperson's budget revenue is included in the month it is received from the client. For example, if a salesperson sells $5,000.00 in advertising in June but the advertising is scheduled

to run in five equal installments from July through November, no revenue will be reflected in June. Instead, $1,000.00 of revenue will be reflected in each month from July to November. Similarly, if, in July, half of the scheduled advertising does not run and that revenue is not realized, the salesperson's revenue figure will be adjusted downward by $500.00 to reflect the actual revenue realized. The percentage of revenue a salesperson realizes on her accounts in a given month relative to her projected budget is produced as her 'revenue-to-budget' figure.

Charter maintains a disciplinary or "coaching" system for a salesperson who fails to meet her projected budget for a given month. Charter refers to these programs as Managed Action Plans or MAPs. When a salesperson fails to meet their sales goal for a given month, they are placed on a MAP. After being placed on a MAP, a salesperson's revenue-to-budget figure is calculated on the basis of a three month rolling average from the three months preceding the plan. There are two ways for an individual to move off of a MAP. First if she increases her three month revenue-to-budget figure to over 85% and meets certain activity goals[1] she returns to the status quo. Second, if her revenue-to-budget figure falls below 60% for two consecutive three-month periods, she progresses from a MAP to a MAP II. If, however, her revenue-to-budget figure remains between 60% and 85%, she remains on the MAP. There is no limit to how long a salesperson can stay on a MAP.

If a salesperson progresses to a MAP II, she has one month to meet the MAP II goals or her employment will be terminated. To meet the MAP II goals a salesperson must meet certain activity requirements while also raising her three month revenue-to-budget figure above 85%. ECF No. 14, Ex. 34 at 32.

---

[1] Activity Goals are sales-related activities that may not reflect directly on revenue figures. These can include making a certain number of new client contacts or concluding a deal for a specified amount for a specified time (*e.g.*, $12,000.00 over 12 months).

**E.**

In July 2013, Gostola learned that her mother needed back surgery. Gostola's parents both live in elderly care facilities. ECF No. 14, Ex. 33 at 15. Within her immediate family, Gostola is her parent's primary caretaker and spends "on average two to three hours Monday through Friday" caring for her parents per day. Id. Upon learning that her mother would need back surgery, Gostola sought full-time FMLA leave from Charter. *Id.* at 118. She initially requested a leave period from August 1, 2013 to September 3, 2013. *Id*. This leave period was approved. *Id*. The actual period during which Gostola was on leave was from August 1, 2013 to September 8, 2013. *Id*. at 205.

When Gostola returned from full-time FMLA leave she requested intermittent leave. *Id*. at 121. She initially requested permission to work only half days during September but that request was denied. *Id*. Instead of working half days, Gostola was told that she could attend her mother's doctor and pain management appointments. *Id*. Gostola was absent for a total of six hours during the month of September after she returned from full-time leave. *Id*. at 124

**D.**

When Gostola returned from leave she remained on the Managed Action Plan which she was on prior to taking FMLA leave. Her MAP for September, which calculated her revenue-to-budget numbers for June, July, and August, was her first MAP to fall below the 60% revenue-to-budget threshold. *Id*., Ex. 30. Due to her FMLA leave, Charter gave Gostola a thirty-day "ramp up" period to account for the fact that she was on leave for the month of August. *Id*., Ex. 36. So when Gostola's October MAP, covering the months of July, August, and September, reflected a three month cumulative revenue-to-budget figure of 49.36%, Gostola was not progressed to a MAP II. Yet, come November, her MAP, covering August, September, and October, reflected a

cumulative revenue-to-budget total that was once again under the 60% threshold (56.33%) and she was progressed to a MAP II.

Other than the thirty-day 'ramp up' period, the fact that Gostola was on FMLA leave for five weeks in August and September was not factored into her performance evaluations. ECF No. 14, Ex. 34 at 30. Her revenue totals for August, and the months that followed, were calculated into her three-month rolling totals without alteration. When Gostola's MAP II from December, covering the months of September, October, and November, reflected a revenue-to-budget figure below 85% and a failure to meet certain activity goals, Gostola's employment was terminated. *Id.*, Ex. 34 at 42 & Ex. 35 at 29-30.

**II.**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id*. at 251-52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III.

Gostola's complaint alleges a single count of a violation of the Act by Charter. ECF No. 1. In her complaint, Gostola pled both an interference and retaliation theory of recovery. *Id*. Gostola has moved for summary judgment solely on the interference theory of recovery. ECF No. 15. Charter has moved for summary judgment on both Gostola's interference and retaliation claims. ECF No. 14. Gostola's claim under the interference theory will be considered first. Because her claim succeeds, her retaliation claim need not be analyzed.

### A.

Gostola claims that Charter interfered with her FMLA rights by terminating her employment on the basis of revenue figures that included data from the time period when she was on FMLA leave. Charter, on the other hand, argues that Gostola's rights under the FMLA were not interfered with because her employment was terminated solely for her poor job performance.

"The interference provision of the FMLA makes it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter.'" 29 U.S.C. § 2615(a)(1). A violation of the act exists if an employer interferes with the FMLA-created right to medical leave or to reinstatement after qualified leave." *Ritenour v. Tennessee Dep't of Human Servs.*, 497 F. App'x 521, 530 (6th Cir. 2012). For Gostola to

prove that Charter interfered with her rights under the Act she must show that "(1) she was an eligible employee, (2) [Charter] is a covered employer, (3) she was entitled to leave under the FMLA, (4) she gave [Charter] notice of her intent to take leave, and (5) [Charter] denied her FMLA benefits or interfered with FMLA rights to which she was entitled." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).

For the purposes of the cross-motions, the parties only disagree as to the final element of proving an interference claim. Charter asserts that Gostola is unable to show that there is a triable issue of fact as to whether her FMLA rights were interfered with. Gostola contends that the facts in dispute can be interpreted but one way: that Charter violated the Act by interfering with her FMLA rights. Gostola explains that Charter explicitly used data from the period in August and September 2013 during which she was on FMLA leave when it determined that her revenue figures were low enough to warrant termination. The fifth element, about which the parties disagree, has been determined to prohibit employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions[.]" 29 C.F.R. § 825.220(c); *see also Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 422 (6th Cir. 2004) (quoting the regulation's prohibition).

In *Wysong v. Dow Chemical*, 503 F.3d 441 (6th Cir. 2007), the Sixth Circuit confronted a situation where an employer considered FMLA leave when taking an adverse employment action. Wysong had alleged that she was terminated in late 2003 because she had taken FMLA leave in 2002. *Id.* at 447. Wysong had taken FMLA leave in both 2001 and 2002 for various reasons including chronic neck pain. *Id.* at 444. In 2003, she told a superior that her neck was ailing her again. *Id.* The superior, for one reason or another, interpreted this as a request for FMLA leave and began the process of leave approval. *Id.* This process led to Dr. Teter, Dow's

Regional Medical Doctor, being informed of Wysong's "request." *Id*. Based on information Dr. Teter received (from a long chain of intermediaries) about Wysong, he decided to place her on work restrictions. *Id*. "According to Dr. Teter, the restrictions were issued out of his concern that Wysong was currently having 'neck trouble,' and that she had missed a lot of work in the past that 'may have been due to [a] previous neck [problem].'" *Id*. (citation to record omitted) (alteration in original). Eventually, Dow issued Wysong a letter that her leave request was approved, at which point Wysong clarified that she made no such request. *Id*. Nevertheless, Dow still issued her a letter placing her on FMLA leave. *Id*.

After Wysong was placed on leave, "Dow's Medical Review Board met to discuss [her] case. The Medical Review Board concluded and Wysong was informed that she would need to pass a functional capacity exam ("FCE") as a condition of returning to work." *Id*. at 445.[2] Dow then obtained a release from Wysong "authorizing Dow to obtain medical information from her treating physicians and providers." *Id*. Dr. Teter discovered in Wysong's medical records what he considered to be evidence of drug dependency. *Id*. Without consulting her physicians he imposed a requirement that she halt pain medications before taking an FCE. *Id*. Wysong did not stop taking her pain medication and Dow refused to give her an FCE. *Id*. As a result, Wysong was eventually placed on unpaid leave, and then terminated pursuant to Dow's "policy of terminating employees who are on a medical leave of absence status for a continuous period of six months." *Id*. (internal quotation marks omitted).

The Sixth Circuit determined that Wysong's complaint pled interference with her rights under the Act. *Id*. at 448. "Dow acknowledge[d] that Dr. Teter considered Wysong's previous

---

[2] "An FCE is used to determine whether an employee is physically capable of performing a specific set of job duties. It consists of a series of tests, conducted by a physical or occupational therapist, and is intended to duplicate actions that the employee would perform at work." *Wysong*, 503 F.3d at 445.

- 9 -

absences when he issued the work restrictions and required Wysong to take the FCE without pain medications[.]" *Id*. Because this requirement led to Wysong's failure to take the FCE, which led to her extended medical leave of absence, which then in turn led her termination, Wysong's dismissal ran afoul of "the rule that 'employers cannot use the taking of FMLA leave as *a negative factor* in employment actions.'" *Id*. (citing 29 C.F.R. § 825.220(c) (emphasis supplied by court). The Sixth Circuit rejected the argument that Wysong's termination did not violate the Act "because Dr. Teter did not write the restrictions solely on the basis of her missing work in 2002." *Id*. at 448. The court noted that "[t]his argument stands in direct conflict" with the Act's regulation governing the consideration of leave in taking employment actions. *Id*. (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 726 (6th Cir. 2003) ("[A] termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA.").

The reasoning of *Wysong* was applied to the facts of a case more closely related to Gostola's case in *Wojan v. Alcon Laboratories, Inc.*, No. 07-11544, 2008 WL 4279365 (E.D. Mich. Sept. 15, 2008). In *Wojan*, the plaintiff was terminated a year after taking FMLA leave. The court found, however, that "the performance issue which resulted in her termination was based in part, on the score calculated during her absence." *Id*. at *5. The defendant in *Wojan* had admitted that the plaintiff's sales numbers declined as a result of her being on leave and that she was evaluated during a time period when she was absent. *Id*. Furthermore, the defendant "admit[ted] that Plaintiff's . . . quotas and performance scores were not adjusted to account for her FMLA leave." *Id*. The court in *Wojan* denied the defendant's summary judgment motion on this ground because "A jury could reasonably find that Defendant used Plaintiff's FMLA leave

against her, at least in part, as a negative factor in evaluating her performance and the terms and conditions of her employment." *Id*. at *6.

**1.**

Gostola's case falls squarely within *Wojan*'s reasoning. In fact, the relationship between Gostola's leave and the adverse employment action she suffered is much less attenuated than in *Wysong* and nearly identical to that in *Wojan*. It is undisputed that Gostola's leave was considered as a negative factor in her eventual termination. Charter disputes Gostola's claim that her sales numbers from August and September were factored into calculating the performance metrics which led to her termination. But Charter's distinction not only fails to make a difference to the thrust of Gostola's claim, it actually further supports it.

Gostola claims in her brief that since she was unable to make sales during the month of August, a month during which she was on leave, and September, a month during which she was on intermittent leave, she could not improve her sales numbers to avoid termination. Charter responds that Gostola fundamentally misunderstands how performance is measured. Revenue, when received, rather than sales, when negotiated, is the performance metric utilized at Charter and there is no direct correlation between the advertising sales in a given month and an employee's revenue realized for that given month. By way of example, Charter indicates that for 2013, Gostola had already met 10% of her August revenue target in January because of sales made in January for advertising space in August. Because advertising is paid for during the month in which the advertisement is used, sales during the month the client agrees to the advertisement may not necessarily impact that month's revenue figures.

But Charter's correction does not alter Gostola's fundamental point: her exercise of FMLA leave, a time in which she could not undertake activities that would increase her revenue

measure, played a part in her negative performance evaluations. What Charter's explanation makes clear is that Gostola's absence in August and the first week of September had a greater impact on her revenue-to-budget measure than merely lowering her August and September results. Gostola's absence for all of August affected her ability to sell advertising that would be reflected as revenue in the September, October, November, and December. Gostola's absence in August would have had knock-on effects in later months since she lost a whole month of revenue-producing sales.

Thus, using the revenue data for any three month period following the month in which Gostola took FMLA leave would, at least in part, use the taking of FMLA leave as a negative factor in her evaluations.

**2.**

Defendant attempts to distinguish *Wojan* on a number of grounds but none have merit. Charter first attempts to distinguish *Wojan* by claiming that Wojan was an excellent performer while Gostola was less than exemplary. ECF No. 18 at 11. This may be true. Wojan was often commended for her stellar performance while Gostola struggled for many consecutive months with meeting her revenue-to-budget goals. But Charter does not explain how this distinction makes a difference to their admission that the months in which Gostola was on leave factored into their decision to progress her to a MAP II and then terminate her employment.

Charter claims that it "simply cannot be argued that Plaintiff's performance suddenly spiraled downward following her return to work, given the dire state of her performance prior to her leave." Again, this may be true, but Charter's MAP policy, by its own admission, permits an individual to stay on a MAP indefinitely if her revenue-to-budget figures remain between 60% and 85%. There is no evidence that Gostola would have inevitably progressed to a MAP II if she

had not gone on leave. Her long period on a MAP, where she consistently attained a 60% revenue-to-budget figure, suggests the contrary. The immediate temporal proximity between Gostola's leave and her dip in performance cannot be ignored, particularly in light of Charter's admission that those figures were used in her performance calculations.

The second way in which Charter attempts to distinguish *Wojan* is by pointing out that, in *Wojan*, the plaintiff's "immediate supervisors made inappropriate comments regarding her maternity leave. . . . In [Gostola's] case, it is undisputed that no one made any negative, inappropriate, or derogatory comments about [Gostola's] need or reason for leave." ECF No. 18 at 11. This distinction between the cases may, once again, be true. It does not, however, have any bearing on the analysis of Gostola's interference claim. The interference theory is explicitly blind to the subjective intent of an employer and focuses instead on objective indicia of interference. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) ("The employer's intent is not a relevant part of the [interference] inquiry[.]"). The court in *Wojan* addressed the derogatory comments made by Wojan's superiors because it undertook an analysis of Wojan's retaliation claims. Such derogatory comments would be appropriately considered under the retaliation theory.

Charter next attempts to distinguish *Wojan* on the basis of the exception it granted to Gostola for her FMLA leave. It claims that Wojan was granted no such extension. Once again, this is a correct observation about the differences between the two cases. Gostola was indeed "given additional time and the opportunity to meet the MAP expectations upon her return to work[.]" ECF No. 18 at 13. But as discussed infra, that period only partly forestalled consideration of Gostola's leave as part of Charter's decision to progress her to a MAP II and then terminate her, it did not preclude it entirely.

Lastly, Charter claims that Gostola's theory of relief confers upon her greater rights than she otherwise would have had, had she not taken FMLA leave. ECF No. 18 at 13. According to Charter, this issue "was neither addressed nor considered by the court in Wojan." *Id*. Charter is correct in saying that *Wojan* did not consider the possibility of conferring upon a plaintiff greater rights than they otherwise would have, something the Act explicitly guards against. Section 2614(a)(3)(B) of the Act reads: "Nothing in this section shall be construed to entitle any restored employee . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C.A. § 2614. But this provision does not operate in the manner Charter alleges.

Charter claims that this provision should shield them from liability for incorporating Gostola's period of leave into her revenue-to-budget figures. Charter asserts that

> Plaintiff's argument that the revenue generated for the months during which she was on a leave of absence should not be used in any way to calculate her annual budget attainment would effectively result in her receiving "greater rights" than every other employee who was absent from work for a reason that did not involve the FMLA . . . simply because the time she was absent qualified under the FMLA.

ECF No. 18 at 13. Reading the Act in this manner would allow the prohibition on granting employees greater rights than they were otherwise entitled to swallow the prohibition on interfering with FMLA rights. Charter is, in essence, arguing that if being absent from work will negatively affect an employee's performance, making that employee susceptible to termination, the fact that the absence was FMLA-qualifying should not protect that individual. That position is fundamentally at odds with the Act.

Section 2614(a)(3)(B) of the Act prevents employees from claiming entitlements unsupported by the record. For example, in *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309 (6th Cir. 2001), the plaintiff claimed he was entitled to be considered for transfer to a new position. He alleged that another individual was transferred because that individual did not have

an impending leave of absence. *Id.* at 316. The Sixth Circuit held that "the FMLA does not grant Skrjanc an independent right to be considered for a transfer, [but] the FMLA does protect Skrjanc's right to be treated the same as other similarly situated employees." *Id.* at 317. Skrjanc's failing, the Sixth Circuit held, was his inability to show that his employer "normally gives employees an opportunity to be considered for new jobs within the company when their positions are eliminated[.]" *Id.* Gostola, by contrast, is not claiming that she is entitled not to be on a performance improvement plan. Instead, she is claiming that she was progressed to a MAP II and her employment terminated, at least in part, because her revenue-to-budget figures included a period in which she was on leave.

**3.**

Apart from attempting to distinguish *Wojan*, Charter also claims that Gostola's motion and her response to Charter's motion ignore the legitimate reason that Charter articulated for her termination. ECF No. 18 at 18. "Both the statute and the DOL regulation likewise establish that interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). "If an employer proves a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee, the plaintiff must 'rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination.'" *Ritenour v. Tennessee Dep't of Human Servs.*, 497 F. App'x 521, 530 (6th Cir. 2012) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir.2012)).

Accordingly, Charter contends, summary judgment should be granted in its favor because of the legitimate, unrelated reason for Gostola's termination that it has provided which Gostola

has not rebutted. Charter claims that "Plaintiff's termination was based solely on her failure to meet her MAP II requirements." ECF No. 14 at 20. But aside from this bare assertion, Charter does not explain how it is "unrelated to the exercise of [Gostola's] FMLA rights[.]" *Edgar*, 443 F.3d at 508. Gostola's termination, as outlined above, is inextricably intertwined with her taking FMLA leave. Charter does not dispute that the MAP which Gostola was issued in November 2013 included revenue data from August, the month in which she was on FMLA leave. Charter likewise does not dispute that it was Gostola's inability to reach her 60% revenue-to-projection goal for that MAP's three month period which led to her progressing to a MAP II. The next month, when she failed to meet her MAP II goals, Gostola was terminated.

Gostola does not rebut Charter's claim that her termination was "based solely on her failure to meet her MAP II requirements." But the reason Charter gives for her termination is not unrelated to her FMLA leave so there is no need for Gostola to rebut it. For the reasons discussed above, Gostola's motion for summary judgment will be granted.

**B.**

Because Gostola prevailed on her interference claim, there is no need to examine the sufficiency of her claims under the retaliation theory. Just because there are two theories does not mean a plaintiff must prove both theories to establish liability under the Act. Similarly, proving both theories of recovery does not give rise to double liability under the Act. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (noting that retaliation and interference are only theories of recovery). In accordance with that fact, Gostola only alleges one count in her complaint. Defendant Charter's Motion for Summary Judgment will be denied as moot.

**IV.**

Lastly, on November 19, 2014, Charter filed an Unopposed Motion to Adjourn the Trial and Related Dates. ECF No. 20. In the motion Charter requests that "the Court . . . adjourn[] the trial date and related dates (motions *in limine*, final pre-trial order, jury instructions, and final pre-trial conference) for 90 days or until May, 2015." *Id*. at 1. The trial is currently scheduled to begin on February 24, 2014. *See* ECF No. 11. Charter asserts that its lead counsel on this matter, Emily Tyler, recently had a trial in the Western District of Michigan adjourned and that trial is now set to begin on January 27, 2014. ECF No. 20 at 2. Charter contends that this will create conflicts with the following scheduling dates in the present case: motions *in limine* (due January 13, 2015), final pretrial order and jury instructions (due February 2, 2015) and the final pretrial conference (scheduled for February 10, 2015).

There is no good cause to grant the requested adjournment. The trial in the present matter is over two months away and is scheduled nearly a whole month after Ms. Tyler's trial in the Western District of Michigan. The trial also forecasts to be relatively short as it will be focused solely on damages. Furthermore, Ms. Tyler is one out of three attorneys of record for Charter. If and when a conflict emerges between the trial date in the Western District and the pretrial matters in the present case, the other listed attorneys of record have the ability to fill in for Ms. Tyler as they have done in the past. *See* ECF No. 20 at 2 n.1 (noting that Ms. Tyler could not attend the settlement conference on August 18, 2014 and had another attorney appear in her stead). Charter's motion will be denied.

**V.**

Accordingly, it is **ORDERED** that Plaintiff Gostola's Motion for Summary Judgment, ECF No. 15, is **GRANTED**.

- 18 -

It is further **ORDERED** that Defendant Charter's Motion for Summary Judgment, ECF No. 14, is **DENIED as moot**.

It is further **ORDERED** that Defendant Charter's Motion to Adjourn, ECF No. 20, is **DENIED**.

Dated: December 17, 2014                                  s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 17, 2014.

                           s/Tracy A. Jacobs
                           TRACY A. JACOBS

---